UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JOHNNIE MERTICE WESLEY,

        Plaintiff,

    v.                                Case No. 18-cv-52-pp

RANDALL HEPP,[1]

        Defendant.

**ORDER DISMISSING PETITION FOR WRIT OF *HABEAS CORPUS* UNDER 28 U.S.C. §2254, DISMISSING CASE AND GRANTING CERTIFICATE OF APPEALABILITY**

On January 9, 2018, the petitioner, who is incarcerated at Waupun Correctional Institution and is represented by counsel, filed a petition for writ of *habeas corpus* under 28 U.S.C. §2254 challenging his 2014 conviction in Milwaukee County Circuit Court for felony murder. Dkt. No. 1. On January 17, 2019, the court screened the petition under Rule 4 of the Rules Governing Section 2254 Cases, allowed the petitioner to proceed and ordered the respondent to answer or otherwise respond to the petition. Dkt. No. 4. Two months later, the respondent answered the petition. Dkt. No. 8. On September 16, 2019, the petitioner filed a brief in support of the petition. Dkt. No. 21.

---

[1] Under Rule 2 of the Rules Governing Section 2254 Cases, "[i]f the petitioner is currently in custody under a state-court judgment, the petition must name as respondent the state officer who has custody." The petitioner is an inmate at Waupun Correctional Institution. https://appsdoc.wi.gov/lop/home.do. This order reflects Warden Randall Hepp as the respondent.

1

Four months later, the respondent filed a brief in opposition to the petition. Dkt. No. 28. On March 11, 2020, the petitioner filed a reply in support of the petition. Dkt. No. 31.

This order denies the petition, dismisses the case and grants a certificate of appealability.

## I.    Background

### A.    Underlying State Case

#### 1.    *Murder of Bruce Lloyd*

On February 10, 2014, the State of Wisconsin filed a criminal complaint in Milwaukee County Circuit Court charging the petitioner with felony murder. Dkt. No. 8-2. The complaint alleged that on February 3, 2014, the petitioner caused the death of Bruce Lloyd while committing armed robbery as a party to a crime. Id. at 1. It described what officers found when they arrived at the scene:

> on February 3, 2014, at 3:36 p.m., Police Officer Thomas Ozelli was sent to a shooting at N. 28th Street and W. Kilbourn Street in the City and County of Milwaukee, Wisconsin. On arriving there Officer Ozelli observed a man who was identified as Bruce Lloyd lying in the street in front of 2803 W. Kilbourn Avenue. In the area of the victim, Bruce Lloyd, was a 2004 Dodge Intrepid vehicle which was parked in front of 2810 W. Kilbourn Avenue. The vehicle was unoccupied and facing westbound in the middle of the westbound traffic lane with the driver's side door open. The keys were in the ignition and that the music was playing at a very high volume inside of the vehicle. The body of Bruce Lloyd was then transferred to Froedtert Memorial Hospital where he arrived at 4:03 p.m. and was pronounced deceased at the hospital at 4:13 p.m.
>
> The body of Bruce Lloyd was then transferred to the Milwaukee County Medical Examiner's Office where an autopsy was done on Bruce Lloyd by Dr. Wieslawa Tlomak on February 4, 2014. Dr. Tlomak found that Bruce Lloyd had sustained a gunshot wound to

his right lower abdomen pelvic area. The bullet traveled from right to left and from back to front and passed through Bruce Lloyd's iliac artery and the bullet was recovered in his right thigh. Dr. Tlomak stated that the cause of death of Bruce Lloyd was exsanguination, loss of blood, from this gunshot wound.

Id.

### 2. *Interrogations*

On February 5, 2014, law enforcement arrested and took the petitioner into custody in connection with the shooting. Dkt. No. 8-8 at ¶2. The next day, Detective Katherine Spano conducted the petitioner's first interrogation while Detective Dave Dalland observed. Id. During this interrogation, the following exchange occurred:

[THE PETITIONER]: You got reason to believe I was responsible?

SPANO: Yes—and that's what I wanna talk to you about okay? Umm—then—there's a lot of information coming out—there's a lot of—a lot of stuff going on with this case—

[THE PETITIONER]: About me?

SPANO: Yea—about you—but before I can talk to you about all of that—I have to have an understanding with you—that you're willing to chat with us about it.

[THE PETITIONER]: Hell nahh-cuz I ain't kill nobody.

SPANO: Okay—so you don't want to talk to us about it—you don't want to answer my questions?

[THE PETITIONER]: I ain't making no statements about no murder—

SPANO: Okay.

[THE PETITIONER]: Cuz I ain't kill nobody.

SPANO: Okay—so you don't want to—so you don't wanna even hear me—can I at least read you your rights so you understand your rights?

3

[THE PETITIONER]: I don't know wanna know nothing about no—

SPANO: Okay.

[THE PETITIONER]: —murder cuz I ain't kill nobody.

SPANO: Okay—so you don't want to talk to me right now?

[THE PETITIONER]: About no murder no.

SPANO: You don't want to hear the facts or the story—

[THE PETITIONER]: About no murder no—

SPANO: —or the reasons of why we believe you were responsible?

[THE PETITIONER]: No.

SPANO: Okay—that's your right—and that's one of your rights that I was going to tell you right here, okay. So what that means Johnnie, because you don't want to talk to us, I—I—I—I can't talk to you obviously—that's your right—and I'm gonna respect your rights—so umm—I will not—I will not be able to get your side of the story—that's okay with me . . . .

Id. at ¶3; Dkt. No. 21 at 6.

Spano told the petitioner that she would "leave it up to him" to decide whether he wanted to talk with her, and that he would be returned to his cell. Dkt. No. 8-8 at ¶4. The interrogation ended at about 12:02 p.m., Miranda[2] warnings were given to the petitioner. Id. Approximately nine hours later, Detective Kevin Klemstein conducted the petitioner's second interrogation. Dkt. No. 8-8 at ¶5. At the second interrogation, Klemstein briefly spoke to the petitioner, the petitioner indicated that he did not want to answer questions

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

4

and the interrogation ended. Id. The petitioner made no other statements during the second interrogation. Id. at ¶5 n.3.

On the following day at about 2:50 p.m., Detective Dalland and Detective Corbett conducted a third interrogation of the petitioner. Id. at ¶6. At this interrogation, the following exchange occurred:

> DALLAND: Look, listen, let me get through what I need to do first and then we can talk if that's what you want. Okay. Is that fair?

> [THE PETITIONER]: *Ain't nothing to talk about doe.* That's what I'm sayin. Ya'll steady questioning me about nothing I don't know nothing about. I don't do nothing. I sit in the house all day. I don't do nothing.

Id. (emphasis in original). After that exchange, Dalland read the petitioner his Miranda rights. Id. at ¶7. "Throughout the remainder of the third interrogation, [the petitioner] made the following statements: (1) 'I ain't got shit to say about no homicide'; and (2) 'Can I go back to my cell now?'" Id.

Dalland later asked the petitioner "if it was the plan that someone would get shot that night." Id. at ¶8. The petitioner responded "no." Id. Dalland then asked if it was the plan that someone would get robbed that night; the petitioner said, "yeah, but I didn't go to the robbery, but he shot himself." Id. The petitioner said that he tried to rob Lloyd at gunpoint, that Lloyd tried to wrestle the gun away from the petitioner and that Lloyd was shot in the process. Id.

The criminal complaint otherwise described the petitioner's third interrogation:

> [O]n the date of February 7, 2014, Detective Dave Dalland of the City of Milwaukee Police Department advised [the petitioner] of his

5

Miranda rights and after advising [the petitioner] of his Miranda rights [the petitioner] gave a statement which is believed to be reliable because it is against his penal interest. [The petitioner] stated that on the date of the homicide that being February 3, 2014, he stated that he had planned to rob Bruce Lloyd. He was going to rob him of his marijuana and whatever else he had. He stated that Bruce Lloyd kept the marijuana in his trunk. On the day of the homicide he had a conversation with Bruce Lloyd where Bruce Lloyd told [the petitioner] to meet him on 28th and Kilbourn Avenue in the City of Milwaukee. [The petitioner] stated he took his black colored .45 caliber pistol with him. He was in his girlfriend's apartment at 2810 W. Kilbourn Avenue in the hallway and he saw Bruce Lloyd pull up in his white Intrepid vehicle. Bruce Lloyd told [the petitioner] to come out and [the petitioner] stated he came out and went into the front passenger seat of Bruce Lloyd's car. Bruce Lloyd gave [the petitioner] a 3 gram bag of marijuana and Bruce Lloyd stated that he wanted $50 in return. [The petitioner] stated he then "upped the pistol" on Bruce Lloyd to rob him of whatever else Bruce Lloyd had on him and he told Bruce Lloyd as he pointed the gun at Bruce Lloyd that he wanted everything that Bruce Lloyd had. Bruce Lloyd then grabbed the barrel of [the petitioner's] gun and they began to struggle over the gun and the gun went off. Bruce Lloyd then began screaming "Ah help me" and got out of the white Intrepid. [The petitioner] stated that after Bruce Lloyd was shot he got out of the passenger seat of the car and ran down to 28th Street. He stated that he did not intend on shooting Bruce Lloyd, that he only wanted to rob him. [The petitioner] stated that he was broke and needed the money so he planned on robbing Bruce Lloyd.

Dkt. No. 8-2 at 2. Officers concluded the third interrogation at about 6:31 p.m.

Dkt. No. 8-8 at ¶8.

        3.    *Motion to suppress and guilty plea*

The State filed the complaint on February 10, 2014. Dkt. No. 8-2 at 2. On March 25, 2014, the petitioner moved to suppress all oral and written statements he made to law enforcement officers. Dkt. No. 8-8 at ¶10. He argued that his statements "were not voluntarily given in that they did not reflect deliberateness of choice, but rather, a conspicuously unequal confrontation in which repeated and persistent pressures were brought to bear

6

on [him] by law enforcement officers until they exceeded [his] ability to resist."
Id.; Dkt. No. 8-3 at 3. During a hearing on April 28, 2014, the circuit court
denied the motion and admitted video recordings of the first and third
interrogations into evidence.[3] Dkt. No. 8-8 at ¶11. The court reasoned that the
petitioner was able to resist, law enforcement committed no misconduct, the
petitioner's statements were voluntary and the petitioner did not unequivocally
invoke his right to remain silent during the third interrogation. Id.

A month later, the petitioner pled guilty to felony murder. Id. at ¶12. On
July 2, 2014, the court sentenced the petitioner to twenty years of initial
confinement followed by seven years of extended supervision. Dkt. No. 8-1.

B.    State Postconviction Proceedings

On March 23, 2015, the petitioner filed a notice of appeal. State v.
Wesley, Milwaukee County Case No. 14CF569 (https://wcca.wicourts.gov). On
appeal, the petitioner argued that the interrogating officers did not
scrupulously honor his invocation of his right to remain silent under Michigan
v. Mosley, 423 U.S. 96 (1975). Dkt. No. 8-5 at 19-20. He asserted that officers
had interrogated him three times in less than thirty-six hours on the same
subject, that he had invoked his right to remain silent to terminate the first two
interrogations and that officers did not inform him of his Miranda rights until
the third interrogation. Id. The petitioner contended that he "unequivocally
invoked his right to remain silent when he said 'Ain't nothing to talk about

---

[3] There was no recording made of the second interrogation because the
petitioner declined to talk. Dkt. No. 8-8 at ¶5.

doe,' 'I ain't got shit to say about no homicide, and 'Can I go back to my cell now?'" Id. at 22. He stressed that the context of his interrogation reflected that he invoked the right to remain silent unequivocally as required by State v. Cummings 357 Wis. 2d 1, 22 (2014) and Berghuis v. Thompkins, 560 U.S. 370, 398 (2010). Id. at 22, 26-27. The petitioner argued that his three statements "clearly expressed a desire not to speak to the police" and "were clearly intended to cut off questioning entirely, not selectively." Id. at 27.

On July 6, 2016, the Wisconsin Court of Appeals affirmed the petitioner's conviction. Dkt. No. 8-8. The court concluded that officers had scrupulously honored the petitioner's right to silence, and that the petitioner did not unambiguously invoke his right to silence during the third interview. Id. at 6. On August 4, 2016, the petitioner filed a petition for review by the Wisconsin Supreme Court. Dkt. No. 8-9 at 19. The petitioner sought review of the same issues he raised on direct appeal—whether officers scrupulously honored his right to remain silent and whether he unequivocally invoked his right to remain silent. Id. at 3. On October 11, 2016, the Wisconsin Supreme Court denied review. Dkt. No. 8-10.

> C.    Federal _Habeas_ Petition

On January 9, 2018, the petitioner filed this federal _habeas_ petition. Dkt. No. 1. The petition asserts two grounds for relief: (1) police did not scrupulously honor his invocation of his right to remain silent under the Fifth Amendment, and (2) during the third interrogation, the petitioner

unambiguously invoked his right to remain silent under the Fifth Amendment when he said "ain't nothing to talk about doe," "I ain't got shit to say about no homicide" and "can I go back to my cell now?" Dkt. No. 1-2 at 1-4. The petitioner argues that the Wisconsin Court of Appeals unreasonably applied <u>Mosley</u> and <u>Thompkins</u> when it rejected his claims on direct appeal. Dkt. No. 21 at 16. The respondent argues that the court of appeals reasonably applied both cases when it rejected the petitioner's claims. Dkt. No. 28 at 14, 17.

## II.  **Analysis**

### A.    <u>Standard</u>

Under the Antiterrorism and Effective Death Penalty Act of 1996, a federal court may grant *habeas* relief only if the state court decision was "either (1) 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" <u>Miller v. Smith</u>, 765 F.3d 754, 759-60 (7th Cir. 2014) (quoting 28 U.S.C. §§2254(d)(1), (2)). A federal *habeas* court reviews the decision of the last state court to rule on the merits of the petitioner's claim. <u>Charlton v. Davis</u>, 439 F.3d 369, 374 (7th Cir. 2006).

"'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" <u>Renico v. Lett</u>, 559 U.S. 766, 773 (2010) (quoting <u>Williams v. Taylor</u>, 529 U.S.

9

362, 410 (2000)). Indeed, "[t]he 'unreasonable application' clause requires the state court decision to be *more* than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 71 (2003) (emphasis added). In other words, §2254(d)(1) allows a court to grant *habeas* relief only where it determines that the state court applied federal law in an "objectively unreasonable" way. Renico, 559 U.S. at 773. "A state court's determination that a claim lacks merit precludes federal *habeas* relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 102 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "The standard under §2254(d) is 'difficult to meet' and 'highly deferential.'" Saxon v. Lashbrook, 873 F.3d 982, 987 (7th Cir. 2017) (quoting Cullen v. Pinholster, 563 U.S. 170, 181 (2011)).

      B.    Mosley Claim

          1.    *Applicable law*

Under Miranda, if a criminal suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Miranda v. Arizona, 384 U.S. 436, 473-74 (1966). However, "*Miranda* cannot be read to create a per se proscription against any further questioning by any police officer, on any topic, once the suspect has expressed a wish to remain silent." United States v. Schwensow, 151 F.3d 650, 658 (7th Cir. 1998) (citing Mosley, 423 U.S. at 102-03). "[T]he admissibility of statements obtained after the person in custody has decided to remain silent

10

depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'" Mosley, 423 U.S. at 104 (quoting Miranda, 384 U.S. at 474, 479).

Under Mosley, "if a suspect invokes the right to remain silent, the authorities must scrupulously honor the suspect's right to cut off questioning but may resume questioning in certain circumstances." Cosby v. Sigler, 435 F.3d 702, 706 (7th Cir. 2006) (citing Schwensow, 151 F.3d at 658). In Mosley, the United States Supreme Court identified factors relevant to whether an interrogator may resume questioning after an individual invokes the right to silence, including (1) "the amount of time that lapsed between interrogations," (2) "the scope of the second interrogation," (3) "whether new *Miranda* warnings were given," and (4) "the degree to which police officers pursued further interrogation once the suspect had invoked the right to silence." Schwensow, 151 F.3d at 658 (citing Mosley, 423 U.S. at 104-05).

"[T]he constitutionality of a subsequent police interview depends not on its subject matter but rather on whether the police, in conducting the interview, sought to undermine the suspect's resolve to remain silent." U.S. v. Montgomery, 555 F.3d 623 (7th Cir. 2009) (quoting Schwensow, 151 F.3d at 659). "This approach naturally follows from *Mosley*, which neither elevates any one factor as predominant or dispositive nor suggests that the enumerated factors are exhaustive, but instead directs courts to focus on whether the confession 'was obtained in a manner compatible with the requirements of the Constitution.'" Schwensow, 151 F.3d at 659 (quoting Miller v. Fenton, 474 U.S.

11

104, 112 (1985)); <u>Montgomery</u>, 555 F.3d at 633. "This test accords with the broader purpose of the Supreme Court's opinion in <i>Mosley</i>. That opinion sought a middle ground between, on the one hand, a blanket immunity from further custodial questioning by any officer on any subject once a suspect has invoked the right to silence, and, on the other hand, repeated rounds of interrogation with only momentary respites when a suspect breaks off questioning." <u>Montgomery</u>, 555 F.3d at 634 (citing <u>Mosley</u>, 423 U.S. at 102-03).

In <u>State v. Hartwig</u>, the Wisconsin Supreme Court stated that "the [<u>Mosley</u>] Court focused on the following factors:"

> (1) The original interrogation was promptly terminated. (2) The interrogation was resumed only after the passage of a significant period of time. (In <i>Mosley</i> it was two hours). (3) The suspect was given complete <i>Miranda</i> warnings at the outset of the second interrogation. (4) A different officer resumed the questioning. (5) The second interrogation was limited to a crime that was not the subject of the earlier interrogation.

<u>State v. Hartwig</u>, 123 Wis. 2d 278, 284 (1985) (citing <u>Wentela v. State</u>, 95 Wis. 2d 283, 293 (1980), <u>overruled by</u> <u>State v. Jennings</u>, 252 Wis. 2d 228 (2002)). The court stated that "[t]he absence or presence, however, of the <i>Mosley</i> factors is not exclusively controlling and these factors do not establish a test which can be 'woodenly' applied." <u>Id.</u> at 284-85 (quoting <u>Wentela</u>, 95 Wis. 2d at 299).

### 2. Discussion

In its decision affirming the petitioner's conviction, the court of appeals found that four of the five <u>Mosley</u> factors were present. Dkt. No. 8-8 at ¶18. It explained that "police terminated the first interrogation promptly after [the petitioner] indicated he did not want to listen to his ***Miranda*** rights or talk

12

about the homicide." Id. The court found that "police resumed questioning after a significant period of time," explaining that "[o]fficers attempted the second interrogation, which ultimately did not occur, approximately nine-and-a-half hours after the first interrogation concluded," and that "the third interrogation did not begin until approximately twenty-seven hours after the first interrogation concluded." Id. at ¶19. The court stressed that "the period of time between interrogations in *Mosley* was two hours," and that "the Wisconsin Supreme Court has upheld intervening time periods which were significantly shorter." Id. (citing State v. Shaffer, 96 Wis. 2d 531, 541 (1980) (finding nine-minute period between invocation of right to silence and resumption of questioning complied with Mosley)). The court observed that Detective Dalland fully informed the petitioner of his rights under Miranda at the outset of the third interrogation, and that different officers questioned or attempted to question the petitioner at each interrogation. Id. at ¶¶20-21. It found moot any consideration of whether officers gave Miranda warnings before the second interrogation "since the second interrogation never actually occurred." Id. Conceding that "the fifth *Mosley* factor—the subsequent interrogation was limited to a crime that was not the subject of the earlier interrogation—was not present," the court noted that the absence of one of the factors was not dispositive. Id. at ¶22 (citing State v. McNeil, 155 Wis. 2d 24, 44 (1990)).

The petitioner argues that the Wisconsin Court of Appeals unreasonably applied Mosley when it concluded that officers scrupulously honored his invocation of his right to remain silent. Dkt. No. 21 at 16, 19. Stressing that

after he spent a night in jail, officers interrogated him three separate times within a thirty-six-hour period regarding the same crime, the petitioner contends that the conduct of law enforcement in this case "can only be viewed as designed to wear [him] down and get him to change his mind about remaining silent." Id. at 19. The petitioner argues that "[t]his case contrasts to *Mosley* in several respects," stressing that (1) officers interrogated him repeatedly regarding the same crime, (2) Detective Dalland was present at his first and third interrogations, and (3) "during the third interrogation, prior to his confession, [the petitioner] used language similar to the language he had used in the first interrogation to cut off questioning." Id. at 20-21. The petitioner asserts that Dalland's presence at multiple interrogations "signaled that [the petitioner's] efforts to remain silent would not be respected." Id. at 20. He concludes that "continued questioning in the third interrogation coupled with the repeated and persistent attempts to question [the petitioner] likely made it clear to [the petitioner] that, regardless of what he said, the police were not going to honor his right to remain silent." Id. at 21.

The respondent asserts that the court of appeals reasonably concluded that officers scrupulously honored the petitioner's right to silence. Dkt. No. 28 at 14. He contends that the court correctly determined that (1) officers ended the first interrogation after the petitioner indicated that he did not want to speak, id. at 14; (2) officers "resumed questioning after a significant period of time," id. at 15; (3) officers gave "complete *Miranda* warnings at the outset of the third interrogation," id. at 15-16; and (4) a different detective questioned

the petitioner during the third interrogation, id. at 16. Conceding that "officers questioned [the petitioner] about the same homicide they had in the first interrogation," the respondent stresses that the presence or absence of the Mosley factors is not dispositive. Id. at 16-17 (citing Hartwig, 123 Wis. 2d at 284-85). According to the respondent, the court of appeals "properly assessed all five *Mosley* factors, utilizing the totality of the record, to reject [the petitioner's] claim that officers did not scrupulously honor his request to remain silent." Id. at 17. The petitioner replies that while Dalland did not ask questions at the first interrogation, "his presence during an interrogation regarding the exact same crime signaled that [the petitioner's] efforts to remain silent would not be respected." Dkt. No. 31 at 4.

This court agrees that the Wisconsin Court of Appeals reasonably applied Mosley when it rejected the petitioner's claim that officers did not scrupulously honor his right to remain silence. The petitioner disagrees with the court of appeals' analysis of the Mosley factors. That disagreement does not require the conclusion that the court's application of Mosley was unreasonable under §2254(d)(1). A reasonable jurist could conclude that the detectives scrupulously honored the petitioner's right to silence—or to cut off questioning—when they (1) terminated the first interrogation (by Spano) following the petitioner's indication that he did not want hear his Miranda rights or talk about a homicide, (2) waited over nine hours before attempting a second interrogation of the petitioner by a different officer (Klemstein), (3) terminated that second interrogation after the petitioner indicated that he did

not want to speak, (4) waited another eighteen hours before interrogating the petitioner for a third time (Dalland) and (5) informed the petitioner of his Miranda rights at the start of the third interrogation. While the interrogations all focused on the same homicide, the absence or presence of any single factor is not dispositive under Mosley. Mosley did not hold that an officer who is present when a suspect invokes the right to remain silent cannot ask questions at a subsequent interrogation, or that the officer's presence at the subsequent interrogation otherwise violates the suspect's constitutional rights. The court of appeals did not unreasonably apply Mosley when it found that officers scrupulously honored the petitioner's right to silence under a totality of the circumstances.

      C.    Thompkins Claim

           1.    *Applicable law*

When invoking the right to remain silent, a suspect must do so unambiguously. Thompkins, 560 U.S. at 381. "The inquiry into whether a person has actually invoked the right to remain silent is an objective one." United States v. Stewart, 902 F.3d 664, 678 (7th Cir. 2018) (citing Davis v. U.S., 512 U.S. 452, 458-59 (7th Cir. 1994)). "An ambiguous or equivocal reference that causes a reasonable officer to understand only that the suspect '*might* be invoking the right' to remain silent is not enough to require the cessation of questioning." Stewart, 902 F.3d at 678 (quoting Davis, 512 U.S. at 459); see also United States v. Sherrod, 445 F.3d 980 (7th Cir. 2006) (finding a

suspect's statement that he was "not going to talk about nothin" did not invoke the right to remain silent).

        2.   *Discussion*

The court of appeals concluded that the petitioner did not unequivocally invoke his right to remain silent during the third interrogation. Dkt. No. 8-8 at 9. It examined each of the statements that the petitioner argued constituted his invocation of the right, finding that none constituted an unambiguous invocation of the right to remain silent. Id. at ¶¶27-34. Regarding the petitioner's statement "Ain't nothing to talk about doe," the court found that the full context of the interrogation allowed a reasonable inference that the petitioner was merely claiming that he did not kill Lloyd. Id. at ¶28. As to the petitioner's statement "I ain't got shit to say about no homicide," the court again concluded "that a reasonable inference would be that [the petitioner] was merely making exculpatory statements." Id. at ¶30. The court considered the petitioner's statement "Can I go back to my cell now?" Id. at ¶¶31-32. It found that statement "akin to the statement '[w]ell, then, take me to my cell. Why waste your time? Ya know?' that was at issue in ***Cummings***." Id. at ¶32 (citing State v. Cummings, 357 Wis. 2d 1, 24 (2014)). The court concluded that the statement was "at best, an equivocal one," and "susceptible to reasonable competing inferences as to its meaning." Id. at ¶¶32-33 (citing State v. Markwardt, 306 Wis. 2d 420, 440 (2007)).

The petitioner alleges that the court of appeals violated Thompkins by concluding that the petitioner did not unequivocally invoke his right to silence

in the third interrogation. Id. at 22. He argues that he "made it sufficiently clear that he wanted to remain silent and the interrogation needed to stop" through several statements he made during the third interrogation. Id. at 24. As to the court's determination that the statement "Can I go back to my cell now?" was equivocal, the petitioner asserts that "there is no United States Supreme Court precedent that holds that ambiguity can be manufactured by examining a suspect's possible motive or intent for invoking his rights." Id. at 24-25. He contends that the court of appeals manufactured ambiguity by "hypothesizing [his] motive or intent," and thus unreasonably applied federal law. Id. at 25. The petitioner argues that the court's decision is like one this court found unreasonable in Saeger v. Avila, 930 F. Supp. 2d 1009, 1010 (E.D. Wis. 2013). Id. He states that "[j]ust as in Saeger, here, the state court found ambiguity in the statement 'Can I go back to my cell now' by hypothesizing [the petitioner's] motive or intent. Thus, the state court decision in this case unreasonably applied federal law." Id.

According to the respondent, the court of appeals reasonably applied Thompkins to find that the petitioner did not unambiguously invoke his right to silence during the third interrogation. Id. at 17. He argues that even if the petitioner meant to invoke his right to silence when he said "Ain't nothing to talk about doe," he did not do so unambiguously. Id. at 18-19. The respondent asserts that at the suppression hearing, Dalland explained that he interpreted the petitioner's statement as denying knowledge of the homicide rather than invoking the right to silence. Id. at 19 (citing Dkt. No. 8-11 at 18). The

18

respondent concludes that the statement "therefore fails the test under *Thompkins* because a reasonable officer, like the experienced homicide detective Dalland, testified that he understood [the petitioner's] statement to be 'not an unwillingness to speak with [him], but an unwillingness to offer any information because he didn't have any information to offer.'" Id. at 19-20 (citing Dkt. No. 8-11 at 18; <u>Thompkins</u>, 560 U.S. at 381).

As to the petitioner's statement "I ain't got shit to say about no homicide," the respondent stresses that the petitioner "made that statement after Dalland read [the petitioner] his *Miranda* rights and [the petitioner] affirmatively waived them." <u>Id.</u> at 20. The respondent stresses that through other statements during the interrogation, the petitioner indicated that he "sought to know what law enforcement knew and from whom they knew it," and that he had an alibi. <u>Id.</u> at 20-21. He contends that rather than expressing a desire not to speak to interrogating officers, the petitioner "was affirmatively stating that he was not responsible for Lloyd's death in the face of evidence and witnesses suggesting that he was." <u>Id.</u> at 21. According to the respondent, the court of appeals' consideration of the petitioner's statement "in context with his other statements and the circumstances" comported with state law. <u>Id.</u> (citing <u>Cummings</u>, 357 Wis. 2d at ¶54). He argues that the petitioner "was denying his guilt, not asserting his right to remain silent." <u>Id.</u> at 22.

The respondent adds that during one exchange with Dalland, the petitioner vacillated "between denying any knowledge or involvement, questioning evidence that linked him to the crime, and actively seeking further

information from law enforcement." Id. (citing Dkt. No. 8-6 at 27-28) (emphasis omitted). To the respondent, this "verbal sparring" and the petitioner's "continued interest in finding out more information while at the same time attempting to discredit information that indicated his guilt" makes clear that the statement "I ain't got shit to say about no homicide" was not an unambiguous assertion of the right to silence. Id. at 23 (citing Thompkins, 560 U.S. at 381). Referring again to Dalland's suppression hearing testimony, the respondent explains that Dalland construed "I ain't got shit to say about no homicide" as a denial of culpability rather than an invocation of the right to remain silent. Id. He asserts that a statement that "is susceptible to more than one interpretation makes it by definition not an unambiguous invocation of the right to remain silent." Id. (citing Thompkins, 560 U.S. at 381).

Distinguishing Saeger, the respondent argues that the petitioner's statement in this case is "susceptible to more than one interpretation." Id. at 25-26. He argues that the petitioner "did not make a blanket statement that he did not want to talk anymore as in Saeger." Id. at 26 (citing Saeger, 930 F. Supp. 2d at 1011). The respondent asserts that the court of appeals' decision "did not undertake a 'foray into the mental state of the accused' in reaching its determination." Id. (citing Saeger, 930 F. Supp. 2d at 1017). He contends that the court instead evaluated the petitioner's statements properly under applicable law. Id. at 26-27 (citing Dkt. No. 8-8 at 11-14; Thompkins, 560 U.S. at 381-82).

20

Based on Detective Corbett's testimony, "the extensive verbal sparring between he and [the petitioner] regarding the evidence in the case" and the charges the petitioner faced, the respondent argues that the statement "Can I go back to my cell now?" was "as much a question about whether the interview was over as it was a statement intending to end the interview." Id. at 31. He maintains that the court of appeals' decision was reasonable based on the record and not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 33 (citing Harrington v. Richter, 562 U.S. 86, 102-03 (2011)).

On reply, the petitioner disagrees with the respondent's argument that the context and surrounding circumstances of the interrogation rendered his alleged invocations of his right to silence ambiguous. Dkt. No. 31 at 4. He argues that the three statements "were made *after* [the petitioner] was asked if he wanted to talk." Id. at 5 (emphasis in original). The petitioner concludes that "[t]hese statements made it sufficiently clear that he wanted to remain silent and the interrogation needed to stop." Id. He asserts that he "did not use any conditional or equivocal words. He did not say 'maybe' or 'I think' or 'if.'" Id. (citing Saeger, 930 F. Supp. 2d at 1015). Explaining that whether a person has invoked the right to silence is an objective inquiry, the petitioner argues that what interrogating detectives believed is irrelevant. Id. (citing Thompkins, 560 U.S. at 381-82). The petitioner argues that at face value, the statement "Can I go back to my cell now?" unambiguously invokes the right to silence. Id. He

says that "one could always imagine plausible alternative motives for stating a desire for interrogation to end," and "[t]he law does not require that suspect unambiguously invoke the right to remain silent and also explain *why* they are doing so." Id. (quoting Saeger, 930 F. Supp. 2d at 1016).

The Wisconsin Court of Appeals did not unreasonably apply Thompkins when it rejected the petitioner's claim that he unambiguously invoked the right to silence during his third interrogation when he said "Ain't nothing to talk about doe," "I ain't got shit to say about no homicide" and "Can I go back to my cell now?" This court's decision in Saeger does not constitute clearly established federal law as determined by the United States Supreme Court. Even if it did, it would not entitle the petitioner to relief. The petitioner in Saeger stated "I got nothin[g] more to say to you. I'm done. This is over." Saeger, 930 F. Supp. At 1015. On *habeas* review, the district court explained that the state court "did not really find that Saeger's actual words were unclear. Instead, the Wisconsin court found that while Saeger's actual words were clear, *he did not really mean them*." Id. (emphasis in original). In this case, the court of appeals concluded that the statement "Can I go back to my cell now?" was "at best, an equivocal one," dkt. no. 8-8 at ¶32, and "susceptible to reasonable competing inferences as to its meaning," id. at ¶33 (citing Markwardt, 306 Wis. 2d at 440). Given the circumstances of the interrogation, a reasonable jurist could have concluded that when the petitioner said "Ain't nothing to talk about doe" and "I ain't got shit to say about no homicide," he meant to deny culpability. A reasonable jurist could find his statement "Can I

go back to my cell now?" subject to multiple interpretations. For example, a reasonable jurist could conclude that the petitioner meant to invoke the right to remain silent, or that he meant to ask whether the detectives had any additional questions, or that he meant to express his desire for the interrogation to end without invoking the right to remain silent. Accordingly, a jurist could reasonably conclude that this statement does not unambiguously invoke the right to remain silent.

## III.    Certificate of Appealability

Under Rule 11(a) of the Rules Governing Section 2254 Cases, the court must consider whether to issue a certificate of appealability. See also 28 U.S.C. §2253(c)(1). This requirement exists because "[a] state prisoner whose petition for a writ of *habeas corpus* is denied by a federal district court does not enjoy an absolute right to appeal." Buck v. Davis, ___ U.S. ___, 137 S. Ct. 759, 773 (2017). This court may issue a certificate of appealability only if the petitioner makes a substantial showing of the denial of a constitutional right. See 28 U.S.C. §2253(c)(2). The standard for making a "substantial showing" is whether "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Peterson v. Douma, 751 F.3d 524, 528 (7th Cir. 2014) (citing Slack v. McDaniel, 529 U.S. 473, 484 (2000)). The court will issue a certificate of appealability because a reasonable jurist could debate whether the petitioner is entitled to relief under 28 U.S.C. §2254(d).

## IV. Conclusion

The court **DISMISSES** the petition for writ of *habeas corpus*. Dkt. No. 1.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

The court **GRANTS** a certificate of appealability.

Dated in Milwaukee, Wisconsin this 7th day of October, 2022.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

24